Argued April 20, affirmed June 14, reconsideration denied July 14, petition for review denied August 3, 1976

STATE OF OREGON, *Respondent,*
*v.*
FRANCISCO MACIAS YBARRA, *Appellant.*
(No. C 75-09-3021 Cr, CA 5407),
(No. C 75-09-3025 Cr, CA 5408)

STATE OF OREGON, *Respondent,*
*v.*
CATHERINE A. COLLIER, *Appellant.*
(No. C 75-09-3020 Cr, CA 5405),
(No. C 75-09-3026 Cr, CA 5406)
(cases consolidated)

550 P2d 763

**■■■■■■■■■■■■■■■■■■■■■■■■■■**

**■■■■■■■■■■■■**

*Mark Silverstein,* Portland, argued the cause for appellants. With him on the brief was J. Bradford Shiley, Portland.

*Al J. Laue,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the briefs were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before Schwab, Chief Judge, and Langtry and Thornton, Judges.

**■■■■■■■■■**

THORNTON, J.

**THORNTON, J.**

Defendants were convicted after jury trial of criminal trespass in the second degree, ORS 164.245(1). They appeal, contending in their two assignments of error that the activities for which they were convicted are protected by the First and Fourteenth Amendments to the United States Constitution.

A summary of the facts leading up to the two trespass arrests is necessary to understand the issue involved.

The defendants are students at Portland State University (PSU), and have for some time been active in the United Farm Workers' movement. In the spring of 1975 defendant Ybarra attempted to have Teamster-harvested lettuce and Gallo wine removed from the menu at PSU. After Dr. Blumel, President of PSU, offered a compromise which defendant Ybarra refused to accept, he and numerous others conducted a "sit in" in Dr. Blumel's office. The protestors subsequently set up several tents and sleeping bags on the library lawn, asserting that they would stay until their demands were met. The protest on the library lawn also involved the use of bullhorns and greatly disrupted classes. We infer that defendant Ybarra was arrested and convicted for his part in these activities.

Miss Collier's involvement in these activities is not clear but it appears that she took part in the camping on the library lawn.

Sometime later, the exact time being unclear, defendants began passing out leaflets on the library lawn and discussing their cause with passers-by willing to listen. Miss Collier testified that they usually came to the library lawn about 11 o'clock in the morning and stayed until the last evening class at 9:30 p.m.

On July 9, 1975, the defendants were on the library lawn sitting under a structure consisting of four small stakes driven into the ground about three feet apart with a sheet draped over it. Campus security guards

and members of the Portland police, pursuant to an order of Dr. Blumel, informed defendants that they would be arrested for trespassing if they did not take down their structure and leave the area. They refused and were arrested.

Substantially the same occurred on July 14 when the defendants were again arrested and charged with criminal trespass. It is these two convictions that are the basis for the present appeals.

Defendants contend that the structure symbolized the plight of the farm workers and was therefore symbolic speech. They argue that both this symbolic speech and the pure speech activities of handing out leaflets and talking to passers-by may not be infringed upon by PSU, absent a showing that these activities substantially interfered with the educational process. In support of this proposition they cite *Tinker v. Des Moines School Dist.,* 393 US 503, 89 S Ct 733, 21 L Ed 2d 731 (1969), and *Grayned v. City of Rockford,* 408 US 104, 92 S Ct 2294, 33 L Ed 2d 222 (1972).

The state argues that the defendants' rights to speech were not infringed upon, that they were free to exercise those rights, but that they were not free to erect a structure on the library lawn. Implicit in the state's argument is the assumption that the erection of the structure is not protected by the First Amendment because it is conduct, not protected speech.

■ School authorities may not infringe upon the exercise of pure speech or conduct tantamount to speech unless the activities materially disrupt the educational process. *Tinker v. Des Moines School Dist., supra; Grayned v. City of Rockford, supra; Burnside v. Byars,* 363 F2d 744 (5th Cir 1966); *State v. Martinez,* 85 Wash2d 671, 538 P2d 521 (1975).

In *Rockford* the defendants were arrested for picketing on sidewalks near a high school during school hours. They were convicted under both an anti-noise ordinance and an ordinance prohibiting picketing near a school. The United States Supreme Court, in affirm-

ing the conviction on the anti-noise charge because there was evidence that classes were disrupted, but reversing the conviction on the picketing charge, stated:

"* * * [W]e do not think that Rockford's [anti-noise] ordinance is an unconstitutional regulation of activity around a school. Our touchstone is *Tinker v. Des Moines School District,* 393 U.S. 503 (1969), in which we considered the question of how to accommodate First Amendment rights with the 'special characteristics of the school environment.' *Id.,* at 506. *Tinker* held that the Des Moines School District could not punish students for wearing black armbands to school in protest of the Vietnam war. Recognizing that ' "wide exposure to . . . robust exchange of ideas" ' is an 'important part of the educational process' and should be nurtured, *id.,* at 512, we concluded that free expression could not be barred from the school campus. We made clear that 'undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression,' *id.,* at 508, and that particular expressive activity could not be prohibited because of a 'mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint,' *id.,* at 509. But we nowhere suggested that students, teachers, or anyone else has an absolute constitutional right to use all parts of a school building or its immediate environs for his unlimited expressive purposes. Expressive activity could certainly be restricted, but only if the forbidden conduct 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others.' *Id.,* at 513. The wearing of armbands was protected in *Tinker* because the students 'neither interrupted school activities nor sought to intrude in the school affairs or the lives of others. They caused discussion outside of the classrooms, but no interference with work and no disorder.' * * *" 408 US at 117-18.

The state contends that the erection of the structure was not speech but instead conduct which can more freely be regulated.

The First Amendment implications in the area of conduct as a mode of expression are unclear and

perhaps incapable of precise rules. In the case of *United States v. O'Brien,* 391 US 367, 88 S Ct 1673, 20 L Ed 2d 672 (1968), the United States Supreme Court considered the contention of a defendant convicted of burning his draft card that his acts were symbolic speech and therefore entitled to First Amendment protection. In rejecting this contention, the Supreme Court stated:

"We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea. However, even on the assumption that the alleged *communicative element in O'Brien's conduct is sufficient to bring into play the First Amendment, it does not necessarily follow that the destruction of a registration certificate is constitutionally protected activity. This Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a *government regulation is sufficiently justified* if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and *if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.* \* \* \*" 391 US at 376-77. (Emphasis supplied.)

After studying the above cited authorities, we conclude as follows:

■■ While the activities of defendants such as handing out leaflets, speaking to passers-by and collecting signatures on petitions were protected under the First Amendment (via Fourteenth Amendment), that amendment would not, in our view, authorize the erec-

tion of the described structure on the library lawn.[1] *United States v. O'Brien, supra.* We are not persuaded by defendants' earnest argument that their action in erecting the structure is immune from PSU's proscription because of its claimed status of "symbolic free speech," or its asserted connection with the handing out of the leaflets and related activities. Defendants' impermissible action in erecting the structure was separable from their permissible activity. We believe that PSU's restriction on the structure was within the power of the university to impose in the furtherance of a legitimate governmental interest. We do not see Dr. Blumel's order as constituting any substantial restriction on defendants' full exercise of their First Amendment freedoms as discussed in *O'Brien.* As the United States Supreme Court said in *Giboney v. Empire Storage Co.,* 336 US 490, 69 S Ct 684, 93 L Ed 834 (1949):

> "* * * [I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced or carried out by means of language, either spoken, written, or printed. * * *" 336 US at 502.

*See also, Cox v. Louisiana,* 379 US 536, 85 S Ct 453, 13 L Ed 2d 471 (1965), where the court said in part:

> "* * * One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest. Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly. * * *" 379 US at 554.

The trial judge did not err in denying defendants' motions for judgment of acquittal and directed verdict of acquittal.

Affirmed.

---

[1] For example, we do not think it could be maintained that the First Amendment would authorize the digging of a symbolic trench on the library lawn to represent the inadequate sanitation provided in some hypothetical farm labor camps.