Argued and submitted October 21, 1985, affirmed in part, reversed in part and remanded February 12, Oregon Beauty Supply's reconsideration and Stebbeds' reconsideration denied March 28, both petitions for review allowed May 20, 1986 (301 Or 165)

# LEWIS,

*Appellant - Cross-Respondent,*

*v.*

# OREGON BEAUTY SUPPLY CO. et al,

*Respondents,*

*and*

# STEBBEDS,

*Cross-Appellant.*

## (A8206-03404, CA A32019)

714 P2d 618

Richard C. Baldwin, Portland, argued the cause for appellant - cross-respondent. With him on the briefs was Baldwin & Brischetto, Portland.

Thomas L. Sauberli, Portland, argued the cause for respondents. With him on the brief was Vergeer, Roehr & Sweek, Portland.

Lloyd Weisensee, Portland, argued the cause for cross-appellant. With him on the brief were Barry L. Adamson,

Portland, and Williams, Fredrickson, Stark, Norville & Weisensee, Portland.

Before Gillette, Presiding Judge, and Van Hoomissen and Young, Judges.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

Plaintiff appeals the trial court's orders in favor of defendants Oregon Beauty Supply Company (OBSC) and Lawrence Stebbeds on her claims of intentional interference with economic relations and outrageous conduct. Defendant Scott Stebbeds cross-appeals the trial court's denial of his motion for a judgment notwithstanding the verdict or a new trial on plaintiff's interference claim.

Viewing the evidence in the light most favorable to plaintiff, it shows that she was an employe of OBSC. She worked directly for Lawrence Stebbeds, OBSC's principal owner and manager. Lawrence's son Scott supervised OBSC's warehouse. Plaintiff began dating Scott. Later, when she wanted to date other men, he became jealous. On one occasion, he became intoxicated and refused to allow her to leave a tavern. When she asked for help, a fight ensued. After that, she refused to date Scott. Thereafter, he began treating her in a hostile manner at work.[1] Several times daily, he stood outside her office and "glared" at her. He told coworkers that she was a drug addict and that she had given him a venereal disease. He cursed her, called her a whore, searched her personal belongings and threw things at her. He intentionally slammed a door into her. He refused to cooperate with her when she needed information from him about shipping and receiving to do her job. There also was evidence that Scott would "fling" paperwork and sample merchandise into her office. He told other employes that she would not be working at OBSC much longer.

Plaintiff complained to Lawrence. He agreed to talk to his son about the problem. When the harassment continued, plaintiff complained to another supervisor. That supervisor was already aware of the problem. She also agreed to talk to Scott. After doing so, the supervisor was "in tears." The next week, she quit her job. Plaintiff met with Lawrence

---

[1] In its summary of the facts, defendant Scott Stebbeds' brief on cross-appeal states in relevant part:

"After plaintiff rejected [Scott's] efforts to sustain a closer * * * relationship, [he] developed a dislike for plaintiff and demonstrated hostility toward her. [He] became 'uncooperative' and 'belligerent' and began a campaign of actions and conduct * * * which he directed at plaintiff at their place of employment. This campaign continued until plaintiff quit her employment."

again. He informed her that Scott was going to continue working at OBSC and that, if she did not like it, she could quit. Still, he discouraged her from quitting and, again, said that he would talk to his son. Nevertheless, the harassment continued. About six months after the harassment began, plaintiff asked Lawrence for time off to look for another job. She also asked him to keep Scott away from her. Lawrence told her that it would be best if she quit. She did so and then brought this action against OBSC, Scott and Lawrence for interference with her employment relationship and outrageous conduct.

The trial court granted OBSC a directed verdict on both of plaintiff's claims. ORCP 60. The court also granted Lawrence a directed verdict on plaintiff's outrageous conduct claim. The jury was instructed that, if it found in favor of plaintiff on her interference claim, it should not consider her outrageous conduct claim against Scott. Plaintiff did not object to that instruction.

The jury found against Lawrence and Scott on the interference claim and awarded $65,000 general damages. Additionally, it awarded $75,000 punitive damages against Lawrence and $25,000 punitive damages against Scott. Thereafter, the trial court granted Lawrence's motion for a judgment notwithstanding the verdict and denied Scott's similar motion.

Because the issues on appeal involve vicarious liability for conduct involved in the cross-appeal, we address some of the cross-appeal issues first. On cross-appeal, Scott contends, in what amounts to a jury argument, that the trial court erred in denying his motion for a judgment notwithstanding the verdict or a new trial on plaintiff's interference claim. He argues that plaintiff voluntarily quit her at will employment and that, thus, he did not interfere with her employment relationship with OBSC. Plaintiff argues that the jury was entitled to find that she did not voluntarily quit and that Scott materially interfered with her employment relationship with OBSC.

Oregon law recognizes a cause of action for intentional interference with economic relations. *Straube v. Larson,* 287 Or 357, 600 P2d 371 (1979); *Top Service Body Shop v. Allstate Ins. Co.,* 283 Or 201, 582 P2d 1365 (1978); *Ron Tonkin*

*Gran Turismo v. Wakehouse Motors,* 46 Or App 199, 611 P2d 658, *rev den* 289 Or 373 (1980). Those cases rely on *Restatement (Second) Torts* § 766 *et seq* (1979). Section 766B provides:

> "One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from the loss of benefits of the relation, whether the interference consists of
>
> "(a)  inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> "(b)  preventing the other from acquiring or continuing the prospective relation."

■      The first question is whether an at will employment relationship can form the basis for a claim of intentional interference with an employment relationship. *Comment g* to section 766, the general section on interference with contractual relations, states that a contract terminable at will may form the basis for an interference claim. Although a party to an at will contract may have a right to terminate the contract, "[u]ntil he has so terminated it, a contract is valid and subsisting, and the defendant may not properly interfere with it." We conclude that an at will employment relationship may form the basis for an interference claim.

The next question is whether a cause of action for intentional interference with an employment relationship can exist if an employe quits. *Restatement (Second) Torts* § 766B *supra,* provides for recovery when the defendant induces or otherwise causes a third person to discontinue an employment relationship or prevents that person from continuing an employment relationship. Scott argues that OBSC did not discontinue its relationship with plaintiff but that she voluntarily quit.[2] Plaintiff argues that to characterize her quitting as voluntary totally ignores the fact found by the jury that Scott's conduct prevented her from working, thereby forcing her to quit.

In this context, to state a claim for interference with

---

[2] *Cf. Springfield Int. Restaurant v. Sharley,* 44 Or App 133, 142, 605 P2d 1188 (1980) (*no* evidence that plaintiff's conduct was other than voluntary.)

an employment relationship plaintiff first must show that OBSC terminated its employment relationship with her. Normally, an employe's resignation is not regarded as a discharge. However, some jurisdictions recognize an exception when the employe is forced to resign.

"The law is not entirely blind, however. It is able, in most instances, to discard form for substance, to reject sham for reality. It therefore recognizes the concept of 'constructive discharge'; in a proper case, it will overlook the fact that a termination was formally effected by a resignation if the record shows that the resignation was indeed an involuntary one, coerced by the employer." *Beye v. Bureau of National Affairs,* 59 Md App 642, 649, 477 A2d 1197, *rev den* 301 Md 639 (1984).

The concept of constructive discharge arose in federal labor and discrimination cases. The theory developed in recognition of the fact that employers who did not want to risk discharging an employe when there was potential liability could simply force an employe to quit by making working conditions intolerable.

"If an employer directly discharges an at-will employee in such a manner as to make the discharge [wrongful] it would defy both reason and fairness to immunize him from liability simply because he has been clever enough to effect the abusive separation by forcing a resignation. That would, in effect, reward him for the extra measure of malefaction—of not only acting in contravention of some clearly mandated public policy but of making things so intolerable that the employee is forced to initiate his own unlawful termination." *Beye v. Bureau of National Affairs, supra,* 59 Md App at 653.

Although this is not a wrongful discharge case, we find that analysis of the constructive discharge issue persuasive. We conclude that the concept of constructive discharge is recognized in Oregon.

Jurisdictions that recognize the concept of constructive discharge have established different elements that the plaintiff must prove. Some hold that the employe must show that the employer's actions were deliberate and taken with the intention of forcing a resignation. *See Johnson v. Bunny Bread Co.,* 646 F2d 1250 (8th Cir 1981); *Muller v. United States Steel Corp.,* 509 F2d 923 (10th Cir), *cert den* 423 US 825 (1975). Others require only that the employe show that a

reasonable person in the employe's position would feel compelled to resign.

> "An employer's activities may be deemed to amount to a constructive discharge only if 'the employer made conditions so intolerable that the employee *reasonably* felt compelled to resign.' * * * The effect on the employee of the conditions imposed, not the employer's intentions, governs the outcome." *Kelleher v. Flawn,* 761 F2d 1079, 1086 (5th Cir 1985). (Emphasis in original.)

*See also Shawgo v. Spradlin,* 701 F2d 470 (5th Cir), *cert den sub nom Whisenhunt v. Spradlin,* 464 US 965 (1983); *Irving v. Dubuque Packing Co.,* 689 F2d 170 (10th Cir 1982); *Johnson v. Bunny Bread Co., supra; Bourque v. Powell Electrical Mfg. Co.,* 617 F2d 61 (5th Cir 1981). We conclude that the objective "reasonable employe" standard is appropriate in constructive discharge cases.

In this case, the jury was entitled to find from the evidence that plaintiff was subjected to extraordinarily difficult and onerous working conditions. The harassment by Scott, his interference with her job performance and the refusal of her supervisors to do anything to remedy the situation presented her with working conditions so intolerable that any reasonable person in her position would have felt compelled to quit. Plaintiff, in order to recover, was not required to bear the considerable emotional distress from intolerable circumstances until she was discharged.

■ To state a claim for interference, a plaintiff next must show that the defendant interfered for an improper purpose or used an improper means which resulted in injury to the plaintiff. *Straube v. Larson, supra,* 287 Or at 361. In this case, Scott began harassing plaintiff and making her job unbearable when she refused to continue dating him. A jury could find that his conduct amounted to sexual harassment. *See Holien v. Sears, Roebuck and Co.,* 298 Or 76, 90, 689 P2d 1292 (1984). Sexual harassment on the job from a supervisor is forbidden discrimination. 298 Or at 90. Thus, Scott used an improper means to achieve the interference. He also made outrageous and defamatory statements about her, which itself is an improper means. *Top Service Body Shop v. Allstate Ins. Co., supra,* 283 Or at 210 n 11. He cursed her, searched her personal belongings and threw things at her. He intentionally slammed

a door into her. He refused to cooperate with her when she needed information from him about shipping and receiving to do her job. We conclude that the trial court did not err in denying Scott's motion for a judgment notwithstanding the verdict or a new trial on plaintiff's interference claim.

■       Proceeding to the appeal, plaintiff first contends that the trial court erred in granting Lawrence a judgment notwithstanding the verdict on the interference claim. She argues that he is liable as a joint tortfeasor, both for acting in concert with Scott and for acquiescing in Scott's conduct. Lawrence contends that he did everything that he could to resolve the problem. There was evidence presented at trial that Lawrence was well aware of Scott's conduct but that he did nothing to stop it. He told plaintiff that Scott would continue working at OBSC and that, if she did not like it, she could quit. The jury could find that Lawrence acted in concert with Scott in harassing plaintiff and that that harassment amounted to interference with her employment relationship with OBSC.

■       Lawrence argues, however, that, even if he did act in concert with Scott, he cannot be held liable, because he and OBSC are one in the same and OBSC cannot be held liable for interference with its own contract. We disagree. We address the issue of OBSC's liability below. The evidence presented at trial showed only that Lawrence is the "vice principal" of OBSC. There was no evidence that he was the sole owner.[3] Thus, Lawrence is a mere agent of OBSC; he can be held personally liable for interference with plaintiff's relationship with OBSC. For that reason, the trial court erred in granting Lawrence a judgment notwithstanding the verdict on plaintiff's interference claim.

■       Plaintiff next contends that the trial court erred in granting OBSC an involuntary dismissal on her interference claim. She argues that the company can be held vicariously liable for the interference of its employes. We disagree. There is liability only when a *third* party interferes in a contractual relationship. Although plaintiff seeks to hold the company vicariously liable rather than directly liable, we hold that a

---

[3] *Rao v. Rao,* 718 F2d 219 (7th Cir 1983) relied on by Lawrence, is distinguishable. In that case the evidence unequivocally showed that the defendant was the *sole* owner of the professional corporation.

company cannot be liable for interference with an employment relationship to which it is a party.

■ Plaintiff last contends that the trial court erred in granting Lawrence and OBSC an involuntary dismissal on her outrageous conduct claim. She argues that Lawrence's conduct was outrageous because, as "vice principal" and her manager at OBSC and Scott's direct supervisor, he was responsible for Scott's outrageous conduct and he failed to stop it. She also argues that, by failing to stop Scott's outrageous conduct, Lawrence acquiesced in it and therefore, is liable for it. Finally, she argues that OBSC is vicariously liable for Scott's and Lawrence's conduct. The jury has not determined whether Scott's conduct was outrageous, because it was instructed not to decide that issue. On this evidence, a reasonable jury could find that it was.

■ In an action based on vicarious liability, the guilty employe need not be a party to the case. The finder of fact can find the conduct of the employe outrageous and hold the supervisor and employer liable without the employe being a party to the action. *See Vendrell v. School Dist No. 26C,* 226 Or 263, 277, 360 P2d 282 (1961); *Wiebe v. Seely, Administrator,* 215 Or 331, 354, 335 P2d 379 (1959). Here the employe, Scott, was a party to the action, but that makes no difference. Therefore, we reverse and remand for a new trial on plaintiff's outrageous conduct claim against Lawrence Stebbeds and OBSC.

On the cross-appeal, Scott also contends that the trial court erred in denying his motion to strike plaintiff's claim for punitive damages and for judgment notwithstanding the verdict on that issue. He argues that the punitive damage award is an unconstitutional infringement of his right of free expression, Oregon Constitution, Article 1, section 8, because plaintiff's allegations deal with speech and therefore, punitive damages cannot be awarded. *See Hall v. The May Dept. Stores,* 292 Or 131, 637 P2d 126 (1981); *Wheeler v. Green,* 286 Or 99, 593 P2d 777 (1979). He argues further that the conduct that was not speech was "expression" that also is protected. *State v. Ybarra,* 25 Or App 633, 550 P2d 763 (1976); *Brookes v. Tri-Co. Met. Transp. Dist.,* 18 Or App 614, 526 P2d 590 (1974). Plaintiff contends that this case is distinguishable from *Wheeler* and *Hall,* because it includes both expressive and non-expressive conduct. We agree.

■        Assuming that there is a limitation on the recoverability of punitive damages for torts consisting of expression, *but see Christofferson v. Church of Scientology,* 57 Or App 203, 252, 644 P2d 577 (1982), the evidence showed that Scott threw things at plaintiff, searched her personal belongings and intentionally slammed a door into her. He contends that those actions cannot form the basis for the award of punitive damages, because he was not charged with assault. He misses the point. In *Wheeler* and *Hall,* the Supreme Court held that punitive damages could not be awarded because the conduct of the defendants in those cases involved only expression. The court did *not* hold that punitive damages could not be awarded in a case that involved both speech and non-expressive conduct. We conclude that there was sufficient evidence of non-expressive conduct on which the jury could base an award of punitive damages.

■        Punitive damages can be awarded when a defendant's conduct is sufficiently arbitrary or unconscionable. *See Chamberlain v. Jim Fisher Motors, Inc.,* 282 Or 229, 578 P2d 1225 (1978); *Noe v. Kaiser Foundation Hosp.,* 248 Or 420, 435 P2d 306 (1967). A plaintiff is not required to show malice if the jury can conclude that the defendant intentionally disregarded the plaintiff's rights. *Senn v. Bunick,* 40 Or App 33, 594 P2d 837, *rev den* 287 Or 149 (1979). We conclude that there was sufficient evidence for the jury to find that Scott intentionally disregarded plaintiff's rights. The award of punitive damages was not error.

Affirmed as to Oregon Beauty Supply Company on the interference claim; reversed and remanded with instructions to reinstate the verdict as to Lawrence Stebbeds on the interference claim; and reversed and remanded as to Lawrence Stebbeds and Oregon Beauty Supply Company on the outrageous conduct claim; affirmed on cross-appeal.