649 F.Supp. 1200 (1986)
UNIVERSITY OF UTAH STUDENTS AGAINST APARTHEID, an unincorporated association; Coalition to Stop Apartheid, an unincorporated association; Mark Nelson; Tom Price; Kim Applequist; and Ruth Nelson, Plaintiffs,
v.
Chase PETERSON, President of the University of Utah; the University of Utah; the State of Utah; and John Does I through X, Defendants.
Civ. No. 86C-0688A.
United States District Court, D. Utah, C.D.
December 8, 1986.
*1201 Brian M. Barnard, Utah Legal Clinic, Salt Lake City, Utah, for plaintiffs.
Ross C. Anderson, Hansen & Anderson, Salt Lake City, Utah, for American Civil Liberties Union, amicus curiae.
David L. Wilkinson, Atty. Gen., and William T. Evans, Asst. Atty. Gen., State of Utah, Salt Lake City, Utah, for defendants.

MEMORANDUM OPINION AND ORDER ON PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF
ALDON J. ANDERSON, Senior District Judge.

I. INTRODUCTION
This action involves a dispute between student groups and the University of Utah over the existence and extent of the groups' right to protest the South African apartheid system and the university's investment policy through the use of physical structures resembling shanties (hereinafter "shanties"). The university gave the students a permit to display the shanties beginning in February, 1986. In late July, 1986, however, university officials determined that the shanties would have to be removed from campus. Attempts to negotiate failed and the student groups brought this action in this court seeking a temporary restraining order and permanent injunctive relief.
After a hearing, the court issued a temporary restraining order dated August 11, 1986, prohibiting the defendants from removing or destroying the displays until a full hearing could be held on the issue of injunctive relief. A hearing on the request for injunctive relief was held on August 29, 1986, at which time the parties stipulated that the hearing would serve as a final trial on the merits pursuant to Fed.R.Civ.P. 65(a)(2). The day long trial included the examination of a number of witnesses and the introduction of documentary evidence. At the conclusion of the trial, the court ruled from the bench, granting the plaintiffs' motion for a permanent injunction with several conditions attached, and reserving the right to file a written opinion, articulating its ruling in further detail.

II. FACTS
On February 24, 1986, a student organization, University of Utah Students Against Apartheid, erected several protest displays resembling "shanties."[1] These *1202 displays were located on a grass area a short distance from the student union building. The students allege, and the university does not dispute, that the shanties were erected to represent the oppressive conditions suffered by blacks in South Africa. The displays were initially constructed without university approval but approval was subsequently obtained in a meeting between Richard Christensen, a member of the university administration, and Connie Spencer, a member of the student protest group.
Testimony given at the trial and sworn statements provided through affidavits indicate that dialogue and interchange on apartheid and University divestiture occurred almost daily at the display site. The shanties resulted in considerable press attention, both supportive and critical of the student protest. See, e.g., Newspaper articles compiled as "Exhibit S" to Affidavit of Alan Chandler (submitted by plaintiffs); Articles included in "Defendant's Submission of Articles and Editorials." Further evidence indicated that a lecture series on the South African situation was held near the displays and that other more spontaneous discussions occurred at the site.
From February 24 to the date of the trial, from one to three shanties existed at the display site. The university does not claim that the displays obstruct pedestrian traffic or otherwise disrupt the regular educational function of the university. Rather, the university contends that the existence of the shanties causes the university considerable expense and exposes the university to large potential liability. As support for this argument, the university points to several violent and potentially dangerous incidents resulting from the existence of the shanties. On two occasions part or all of the shanties were destroyed in nighttime attacks. On another occasion one shanty was set on fire. On a final occasion a Molotov Cocktail was thrown in the vicinity of the shanties. Although no injuries were sustained in these attacks, it forced the university to increase police protection of the shanties and increased the university's estimated potential liability. The university introduced evidence that as a result insurance through the State Risk Management Pool, a form of state government self-insurance, was cancelled with respect to any liability resulting from the existence of the shanties. See Letter from Alan Edwards to President Chase Peterson (Aug. 20, 1986) (Defendant's Exhibit "C").
The administration allowed the shanties to remain for approximately six months before informing the students that it was considering requiring their removal. During this time President Peterson gave support to the right of the students to speak to the issue through use of the shanties. On July 14, 1986, the university's Institutional Council voted against divestiture.[2] On July 17, 1986, President Peterson requested a meeting with the protesting students. A meeting was subsequently held on August 6, 1986, in which President Peterson informed the students that the shanties had to come down. Apparently, the parties made some attempt to negotiate. The plaintiffs stated they would provide their own insurance and security. They further offered to use only one portable shanty and display it only during daytime hours. President Peterson disputed student testimony regarding the exact content of the offers but stated that he told the students that they could display the shanties if they would make them portable and bring them on campus only on limited occasions as permitted by the administration. Upon failing to reach an agreement, the students initiated this action, alleging that the university's removal of the shanties would violate their right to freedom of speech under the first amendment.

III. DISCUSSION

A. The Scope of the First Amendment

The initial inquiry for the court in this case is to determine whether the shanties *1203 themselves come within the scope of the first amendment's protection of free expression.[3] It has long been clear that "speech" within the meaning of the first amendment's guarantee of "freedom of speech" includes more than mere verbal or written communication. Despite distinctions between some types of conduct not typically involving speech and what has been labeled "pure speech", protected speech under the first amendment can include expressive and symbolic conduct.[4] Various forms of nonverbal expression have been extended first amendment "free speech" protection by the Supreme Court. Expressive conduct, including demonstrating, picketing, marching and conducting "sit-ins," has received first amendment protection. See, e.g., Shuttlesworth v. City of Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (marching); Brown v. Louisiana, 383 U.S. 131, 89 S.Ct. 935, 22 L.Ed.2d 162 (1966) (public library sit-in); Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963) (demonstrating); Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940) (picketing). Other expressive conduct of a more symbolic nature, including wearing armbands, desecrating an American flag and displaying a red flag to advocate the overthrow of the government, has also received protection.[5]See, e.g., Spence v. Washington, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (affixing peace symbol to an American Flag); Tinker v. Des Moines School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (wearing black armbands to public high school); Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931) (displaying a red flag).[6]
Of course, the free speech protection extended to nonverbal expression is not without limits. Chief Justice Warren, writing for the majority in United States v. *1204 O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), said:
We cannot accept the view that an apparently limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea.
Id. at 376, 88 S.Ct. at 1678 (upholding a conviction for burning a draft card without deciding to what degree the action raised first amendment considerations). Although the speech/conduct dichotomy was identified in O'Brien, not until Spence v. Washington, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), did the Court attempt to articulate standards which could be applied to other forms of symbolic expression or conduct. In Spence, a college student was prosecuted for violating a Washington statute which prohibited attaching extraneous material to a United States flag. Spence had attached a large peace symbol to a flag and then hung the flag upside down out of his apartment window. Three police officers viewed the flag from the street and arrested Spence. In reviewing the case, the Supreme Court reiterated its caution in O'Brien that not all conduct can be labeled speech. Id. at 409, 94 S.Ct. at 2729. The Court ruled, however, that under the circumstances in Spence, the display of the flag was symbolic expression protected under the first amendment. In reaching this conclusion, the Court stated:
[T]he nature of the appellant's activity, combined with the factual context and environment in which it was undertaken, lead to the conclusion that he engaged in a form of protected expression.... In many of their uses flags are a form of symbolism comprising a "primitive but effective way of communicating ideas ...," and "a short cut from mind to mind." ... Moreover, the context in which a symbol is used for purposes of expression is important, for the context may give meaning to the symbol. See Tinker ... [The appellant's act] was a pointed expression of anguish by appellant about the then-current domestic and foreign affairs of his government. An intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it.
Id. at 409-11, 94 S.Ct. at 2729-30 (citations omitted). The Court in Spence focused on two aspects of a symbolic expression to determine its status as protected speech.[7] The first factor focused on the actor: is there an intent to convey a particularized message? The second factor focused on observer understanding: is there a substantial likelihood that the message will be understood by those who view it? Application of the approach taken by the Court in Spence to the displays in this case makes it clear to this court that the shanties represent symbolic expression which is protected by the first amendment.
There is little doubt that the students intended to convey a particularized message through construction and display of the shanties. The photographs introduced as evidence by the plaintiffs (Plaintiffs' Exhibits 1-7) reveal the unique nature of the displays and the clear intent by their builders to communicate a message. The structures themselves have few, if any, nonexpressive benefits.[8] They are not like a table, booth, kiosk or other temporary structure from which protected speech can be disseminated; rather, they effectively serve as the speech itself. Further, on all outside walls of the shanties, words and drawings serve to explain the anti-apartheid/pro-divestiture message of the protesters. Although only the shanties themselves *1205 are at issue in this case, it is instructive to note that the students themselves maintained a constant vigil at the shanties to discuss the apartheid/divestiture issue and to further communicate their ideas to others. The defendants have not argued that the plaintiffs had any other purpose in displaying the shanties and the court is convinced that the shanties themselves make their creators' intention to communicate self-evident.
The second factor set forth in Spence, the likelihood that the message will be understood by those who observe it, is similarly satisfied in this case. Indeed, it is hard to imagine a more effective transmission of a message than that which has occurred by using the shanties to protest apartheid.[9] Shanties, as structures, have come to symbolize the poverty, oppression and homelessness of South African blacks and have been used by student groups throughout the United States to convey this same message. Much like a flag, a cross, or the black armbands used during the Vietnam war, the shanties are now understood to represent a strong statement condemning apartheid and protesting university investment in South Africa.[10] As the Supreme Court found in Spence, "in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." Spence, 418 U.S. at 411, 94 S.Ct. at 2730. Similarly, "the nature of the [plaintiffs'] activity, combined with the factual context and environment in which it was undertaken, lead to the conclusion that [they] engaged in a form of protected expression." Id. at 409-10, 94 S.Ct. at 2729-30.
Other courts have applied the Spence test to symbolic expression and found such expression to be within the scope of the first amendment. In Monroe v. State Court, 739 F.2d 568 (11th Cir.1984), the Eleventh Circuit held that a woman's burning of an American flag during a public demonstration protesting the United States' involvement in Iran was "symbolic expression within the purview of the first amendment." Id. at 572. The court found that the protester-intent and observer-understanding requirements of Spence were satisfied under the circumstances surrounding the flag burning.
In United States ex rel. Radich v. Criminal Court, 385 F.Supp. 165 (S.D.N.Y. 1974), the court applied Spence to a claim that the disfigurement of the American flag as part of several sculptures was protected speech under the first amendment. The court permitted the use of the flag in the sculptures, finding that the use was intended to be communicative and would be understood as such by visitors to the gallery where the sculptures were displayed. Id. at 173-74.
In a pre-Spence decision, the Court of Appeals for the District of Columbia found that a three dimensional display containing eleven styrofoam tombstones commemorating those who died in Southeast Asia was entitled to some degree of first amendment protection. The court stated:
It may be true that erection of a display is not what one would call prototypical First Amendment activity or precisely the mode of expression which the framers *1206 of the Bill of Rights envisioned. But it is a vehicle for expression of views nonetheless and, hence, entitled to a degree of First Amendment protection.
Women Strike for Peace v. Morton, 472 F.2d 1273, 1288 (D.C.Cir.1972).
The Spence analysis distinguishes the shanties from other conduct or symbolism which may arguably fall outside of first amendment protection. For instance, the defendants in their trial brief compare the shanties to jogging without wearing a shirt, discussed in DeWeese v. Town of Palm Beach, 616 F.Supp. 971 (S.D.Fla. 1985). In DeWeese, the plaintiff claimed that "by refusing to wear a shirt, he communicate[d] a philosophy to members of the public who observe him about health, fitness and the oneness of mind and body." Id. at 978. Even if it is assumed that DeWeese intended to communicate a message by jogging without a shirt, it is difficult to identify his message as "particularized." Further, it is doubtful that there was a "great likelihood" that others would understand it. Male joggers are frequently seen without shirts. It is unlikely that many of them intend to convey a particularized message, nor probable that onlookers would attribute a special message to such conduct.[11]
Other forms of expressive conduct are similarly ambiguous and courts have been reluctant to bring them within the purview of the first amendment. Examples of this type of conduct include leaving a wrecked truck in a yard, Davis v. Norman, 555 F.2d 189 (8th Cir.1977) (assuming arguendo that the display of the truck was symbolic speech but finding that the city ordinance met the O'Brien test),[12] wearing one's hair long, Freeman v. Flake, 448 F.2d 258 (10th Cir.1971) ("wearing of long hair is not akin to pure speech. At most it is symbolic speech indicative of expressions of individuality rather than a contribution to the storehouse of ideas" id. at 260), cert. denied, 405 U.S. 1032, 92 S.Ct. 1292, 31 L.Ed.2d 409 (1972), refusing to wear a tie as required of a teacher by a school dress code, East Hartford Educ. Ass'n v. Board of Educ., 562 F.2d 838 (2d Cir.1977) (en banc) ("claims of symbolic speech made here are vague and unfocused" id. at 858), using a canopy as part of a university sit-in, State v. Ybarra, 25 Or.App. 633, 550 P.2d 763 (1976),[13] or leaving parcels unattended on the sidewalk in front of the White House, White House Vigil v. Clark, 746 F.2d 1518, 1538-41 (D.C.Cir.1984). In White House Vigil, the Park Service had enacted a regulation prohibiting leaving unattended parcels on the White House *1207 sidewalk. The court applied the Spence factors to determine that "[a]t most, the activity proscribed by the parcels restriction facilitates expression." Id. at 1540 (emphasis in original) (footnote omitted). In arriving at this conclusion the court stated:
Courts have correctly recognized that some forms of conduct are sufficiently expressive to warrant constitutional protection, but by no means all conduct which is intended by the actor to express an idea is speech. Intent is but one half the calculus; a court must also consider whether "in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." ... Appellees have made no credible claim that [placing parcels on the sidewalk] is "inten[ded] to convey a particularized message"; nor have they shown that onlookers would regard their conduct as communicative.
Id. at 1539-40 (emphasis in original) (footnotes omitted). Even assuming an intent to convey a particularized message, these types of conduct frequently occur for noncommunicative reasons and thus blur any message intended to be conveyed. This is not to say that this kind of conduct can never be protected, but a court must be convinced that what it is protecting is intended to and reasonably may communicate a "particularized message."
A particularly difficult claim of protected expression arose in Community for Creative Non-Violence v. Watt, 703 F.2d 586 (D.C.Cir.1983) (en banc), rev'd, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), where a homeless rights group argued that their "expressive sleep" should be protected by the first amendment. The plurality opinion and concurring opinions relied on Spence to determine that under the unique facts of the case, expressive sleep could be protected under the first amendment.[14]See also United States v. Abney, 534 F.2d 984, 985-86 (D.C.Cir.1976). Although the Supreme Court reversed the decision without reaching the first amendment question, the Court was apparently skeptical of the actual intent of the protesters in including sleep as part of the protest. "[A]lthough we have assumed for present purposes that the sleeping banned in this case would have an expressive element, it is evident that its major value to this demonstration would be facilitative." Clark v. Community for Creative Non-Violence, 468 U.S. 288, 296, 104 S.Ct. 3065, 3070, 82 L.Ed.2d 221 (1984).[15]
The cases discussed above illustrate the differences between the shanties involved in this case and other types of symbolic expression that pose more difficult questions. The intent in erecting the shanties is clear and observer understanding indisputable. As a result, a Spence analysis compels this court to hold that the shanties are symbolic expression protected under the first amendment.

B. Validity of the Order to Remove the Displays

Having concluded that the shanties are a form of speech, however, does not *1208 mean that any infringement on the right to display them would be unconstitutional. The first amendment does not offer absolute protection to all speech under all circumstances and in all places. See, e.g., Clark v. Community for Creative Non-Violence, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (sleeping as part of round-the-clock vigil not protected by the first amendment); Paris Adult Theatre I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973) (obscene material not protected); United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (draft card burning not constitutionally protected).

1. Character of the University as a Public Forum

Even protected speech is not equally permissible in all places and at all times. "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." Cornelius v. NAACP Legal Defense & Education Fund, 473 U.S. 788, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). In this case we are confronted with a situation where students and recognized student groups[16] are conducting a protest on a state university campus at an outdoor location near the student union building. The Supreme Court, addressing the right of free expression in the campus environment, has stated:

Tinker [393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)] held that the Des Moines School District could not punish students for wearing black armbands to school in protest of the Vietnam war. Recognizing that "`wide exposure to ... robust exchange of ideas'" is an "important part of the educational process" and should be nurtured, id., at 512, 89 S.Ct. at 739, we concluded that free expression could not be barred from the school campus. We made clear that "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression," id., at 508, 89 S.Ct. at 737, and that particular expressive activity could not be prohibited because of a "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint," id., at 509, 89 S.Ct. at 738. But we nowhere suggested that students, teachers, or anyone else has an absolute constitutional right to use all parts of a school building or its immediate environs for his unlimited expressive purposes. Expressive activity could certainly be restricted, but only if the forbidden conduct "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." Id., at 513, 89 S.Ct. at 740.
Grayned v. City of Rockford, 408 U.S. 104, 117-18, 92 S.Ct. 2294, 2303-04, 33 L.Ed.2d 222 (1972) (ellipses in original) (footnote omitted). See also Widmar v. Vincent, 454 U.S. 263, 267 n. 5, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) ("This Court has recognized that the campus of a public university, at least for its students, possesses many of the characteristics of a public forum.... `The college classroom with its surrounding environs is peculiarly `the marketplace of ideas.' Healy v. James, 408 U.S. 169, 180, 92 S.Ct. 2338, 2345, 33 L.Ed.2d 266 (1972)"); Wright, The Constitution on Campus, 22 Vand.L.Rev. 1027, 1039-46 (1969).
In Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the Supreme Court held that the existence of a right of access to public property for the exercise of free speech rights depends on the character of the property at issue. Id. at 44, 103 S.Ct. at 954. The Court identified three categories of public forums: the "quintessential" public forum, the limited public forum and the nonpublic forum. In discussing these categories, the Court explained: *1209 "A second category consists of public property which the State has opened for use by the public as a place for expressive activity." Id. at 45, 103 S.Ct. at 954. In describing this type of forum the court noted: "A public forum may be created for a limited purpose such as use by certain groups, e.g., Widmar v. Vincent (student groups)...." Perry, 460 U.S. at 46 n. 7, 103 S.Ct. at 955, n. 7.
In the case at hand the evidence reveals that, as to students and student groups, the university campus is at least a limited public forum. Section 2.02 of the university-enacted Student Bill of Rights states:
Students shall have the right to freedom of speech and assembly without prior restraint or censorship, subject only to clearly stated reasonable and nondiscriminatory rules and regulations regarding time, place, and manner.
University Regulations, Ch. 10, Student Code, art. II, § 2.02. The Student Code is "officially sanctioned by the Institutional Council of the University." Student Code Brochure at p. ii (Defendant's Exhibit "G"). Testimony indicates that, in fact, the university has granted permits to student groups conducting rallies and demonstrations.[17] The evidence before the court is sufficient to find that the university campus is available to students as a public forum. See Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); Glover v. Cole, 762 F.2d 1197, 1200-01 & n. 7 (4th Cir.1985).

2. University Regulation of the Protected Expression

The university does have authority to regulate student expression. It can "enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." Perry, 460 U.S. at 45, 103 S.Ct. at 954. As applied to symbolic expression, the Court has stated:
Symbolic expression of this kind [sleep] may be forbidden or regulated if the conduct itself may constitutionally be regulated, if the regulation is narrowly drawn to further a substantial governmental interest, and if the interest is unrelated to the suppression of free speech.
Community for Creative Non-Violence, 468 U.S. at 294, 104 S.Ct. at 3041 (citing United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)). The Court further stated that "[e]xpression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, and manner restrictions." Id. See also Regan v. Time, Inc., 468 U.S. 641, 648, 104 S.Ct. 3262, 3266, 82 L.Ed.2d 487 (1984); City Council v. Taxpayers for Vincent, 466 U.S. 789, 808, 104 S.Ct. 2118, 2130, 80 L.Ed.2d 772 (1984); Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640, 647-48, 101 S.Ct. 2559, 2563-64, 69 L.Ed.2d 298 (1981); Grayned v. City of Rockford, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972); Wright, The Constitution on Campus, 22 Vand.L.Rev. 1027, 1043 (1969) (first amendment imposes three rules on state universities); Note, Time, Place, and Manner Regulations of Expressive Activities in the Public Forum, 61 Neb.L.Rev. 167 (1982). As pointed out earlier, the university itself has enacted a student code which, consistent with constitutional standards, allows it to regulate student free speech only through "clearly stated reasonable and nondiscriminatory rules and regulations regarding time, place, and manner." University Regulations, ch. X, Student Code, art. II, § 2.02.
The university's determination that the shanties would have to be removed was not based on the application of any specific *1210 university regulations.[18] Rather, the university administration concluded that it would be in the best interests of the university to require their removal. This approach, however, is not appropriate as a means of limiting or prohibiting the exercise of free speech rights. Although the university can regulate free speech interests through clearly stated, narrowly tailored regulations enacted to further substantial government interests, in this case the university had not enacted such regulations. Formally drawn regulations are necessary to insure that restrictions on free speech are content-neutral.[19] They also serve as guidelines which enable students and student groups to plan and develop their free speech activities in a way that will be effective for the students and yet acceptable to the administration.[20]
The cases cited by the university in support of its right to order the removal of the shanties involved alleged violations of formally enacted regulations. See Clark v. Community for Creative Non-Violence, 468 U.S. 288, 290-91, 104 S.Ct. 3065, 3067-68, 82 L.Ed.2d 221 (1984) (no-camping regulations); City Council v. Taxpayers for Vincent, 466 U.S. 789, 791, 104 S.Ct. 2118, 2121, 80 L.Ed.2d 772 (1984) (city sign-posting ordinance); United States v. O'Brien, 391 U.S. 367, 371, 88 S.Ct. 1673, 1676, 20 L.Ed.2d 672 (1968) (Selective Service regulation); DeWeese v. Town of Palm Beach, 616 F.Supp. 971, 975 (S.D.Fla.1985) (ordinance requiring joggers to be clothed above the waist).[21] The history of the CCNV case is particularly instructive. In the initial case, the circuit court ruled that the National Park Service had applied regulations to the expressive sleeping which did *1211 not in fact apply to the sleeping. Since the court concluded that the activity did not violate the regulation, it affirmed the district court's order allowing the protesters to sleep in Lafayette Park as part of their protest. Community for Creative Non-Violence v. Watt (CCNV I), 670 F.2d 1213, 1215-17 (D.C.Cir.1982). The Park Service then formally revised its regulations to expressly proscribe sleeping. See Community for Creative Non-Violence v. Watt (CCNV II), 703 F.2d 586, 588 (D.C.Cir. 1983), rev'd, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). Once specific regulations were in place and a violation of those regulations was alleged, the court could rule on whether the regulations were a constitutionally permissible infringement on free speech rights. Ultimately, the Supreme Court held that they were a permissible restriction. Clark v. Community for Creative Non-Violence, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).
In the hearing before this court, President Peterson cited a number of reasons for requiring the removal of the shanties. "Major" and "predominant" reasons included overall cost, difficulty and expense in obtaining liability insurance, risk of physical harm, potential university liability and aesthetic concerns.[22] However substantial these interests are, they cannot be used in their present form to circumscribe the students' speech interests. The court encourages the university to use the reasons set out above as a basis for enacting "clearly stated reasonable and nondiscriminatory rules and regulations regarding time, place and manner" which are not content related that will enable the university to protect its interests while allowing the maximum possible exercise of student expression.
The court reaffirms its earlier ruling, denying the defendants' motion for summary judgment and granting the plaintiffs' motion for an injunction. The court is aware of the further trouble which has occurred at the site since the oral order. At the hearing it was suggested that the shanties be made portable and be removed at night. The court has broad authority to mold an equitable remedy in a fashion that will serve the interests of all involved. The Supreme Court has stated:
Moreover, in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable....
In equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests, notwithstanding that those interests have constitutional roots.
Lemon v. Kurtzman, 411 U.S. 192, 200-01, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973). Exercising its equitable powers, the court further orders that pending the enactment of the university's rules and regulations the shanties be made portable and be removed at night. Testimony from the University of Utah Chief of Police and others revealed that the acts of violence all occurred at night. Further, the bulk of the alleged increase in police protection costs were incurred during night shifts. Finally, the free speech interests of the students do not appear to be furthered by nighttime display. Certainly, requiring nightly removal of the displays represents an increased burden on the students, but the burden is incidental to the free speech interest itself.
If the parties are unable to agree on other problems that arise relating to the imposition of the injunction, they may request the court's further assistance. This memorandum opinion and the accompanying injunction fully resolve the issues before the court and obviate the necessity of considering any other relief requested by the parties.
NOTES
[1] For discussions of the significance of the displays resembling shanties, see the articles cited at infra, note 10.
[2] President Peterson indicated that divestiture had previously been considered by the Institutional Council in 1978 and rejected at that time. He further testified that the Council could be petitioned to reconsider divestiture at any time, but that it was up to the Council to determine whether it would in fact reconsider the issue.
[3] Frequently, the Supreme Court has used the term "expression" as the equivalent of "speech." See, e.g., Grayned v. Rockford, 408 U.S. 104, 117, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972); Healy v. James, 408 U.S. 169, 171, 92 S.Ct. 2338, 2341, 33 L.Ed.2d 266 (1972); New York Times Co. v. United States, 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971). See also Nimmer, The Meaning of Symbolic Speech Under the First Amendment, 21 UCLA L.Rev. 29, 33-34 n. 21 and accompanying text (1973).
[4] A number of scholarly books and articles have discussed the status of symbolic expression under the first amendment. See, e.g., T. Emmerson, The System of Freedom of Expression (1970); J. Searle, Speech Acts (1970); Baker, Scope of the First Amendment Freedom of Speech, 25 UCLA L.Rev. 964, 1009-29 (1978); Nimmer, The Meaning of Symbolic Speech Under the First Amendment, 21 UCLA L.Rev. 29 (1973); Leahy, "Flamboyant Protest," the First Amendment and the Boston Tea Party, 36 Brooklyn L.Rev. 185 (1970); Henkin, The Supreme Court, 1967 Term  Forward: On Drawing Lines, 82 Harv.L.Rev. 63 (1968); Comment, First Amendment Protection of Ambiguous Conduct, 84 Colum.L.Rev. 467 (1984); Comment, Symbolic Speech, 43 Fordham L.Rev. 590 (1975); Note, Clark v. Community for Creative Non-Violence: The Demise of First Amendment Protection for Symbolic Expression?, 36 Mercer L.Rev. 1371 (1985); Note, Symbolic Conduct, 68 Colum.L. Rev. 109 (1968).
[5] The shanties seem to fit more closely with this type of symbolic expression than with conduct such as picketing or marching.
[6] Louis Henkin, commenting on the Supreme Court's decision in United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), stated:

There is nothing intrinsically sacred about wagging the tongue or wielding a pen; there is nothing more intrinsically sacred about words than other symbols. Other kinds of communication are also effective  Beethoven's Ninth Symphony or Picasso's Guernica, and saluting a flag, kneeling in worship, holding a beloved hand. Even singular, idiosyncratic forms of expression can prove no less articulate, as when Simeon spent his days sitting on a pillar in the desert or the King of Denmark wore a six-pointed star.
The Constitution protects freedom of "speech," which commonly connotes words orally communicated. But it would be surprising if those who poured tea into the sea and who refused to buy stamps did not recognize that ideas are communicated, disagreements expressed, protests made other than by word of mouth or pen.... The meaningful constitutional distinction is not between speech and conduct, but between conduct that speaks, communicates, and other kinds of conduct.
Henkin, The Supreme Court, 1967 Term  Foreward: On Drawing Lines, 82 Harv.L.Rev. 63, 79-80 (1968).
[7] A thorough discussion of these two factors and their possible application to various forms of symbolic expression can be found in Note, First Amendment Protection of Ambiguous Conduct, 84 Colum.L.Rev. 467, 476-505 (1984). See also Note, Symbolic Speech, 43 Fordham L.Rev. 590, 599-605 (1975).
[8] In this sense they are similar to oral or written communication which rarely, if ever, is resorted to for any other reason than to express ideas.
[9] While the mass media often pays little attention to unorthodox or unpopular ideas, dramatic displays of action capture media attention when words alone will not.
[10] Across the nation newspapers and magazines are replete with articles on apartheid protesters and their "shanties." See, e.g., Seligman, Shantyism: Students Protesting U.S. Investments, Fortune, June 9, 1986, at 156; Conant, Divisions over Divestments, Newsweek, June 2, 1986, at 66; Gitlin, Divestment Stirs a New Generation, Nation, May 18, 1985, at 585; Milloy, Shantytown Protests on the Campus, Wash. Post, May 6, 1986, at B3; Auer, U. Apartheid Opponents Erect Shanty in Protest, Salt Lake Trib., Feb. 25, 1986, at B1; N.Y. Times, Feb. 10, 1986, § I, at 12, col. 2 (photo of shanty on Darmouth campus); N.Y. Times, Feb. 2, 1986, § I, at 14, col. 2. See also Worsnop, Free Speech on Campus, Editorial Research Report, Cong. Quarterly, Feb. 12, 1986. Media attention is a strong indication of observer understanding because it highlights the communicative nature of the very form of conduct undertaken. See, e.g., Maynard v. Wooley, 406 F.Supp. 1381, 1387 n. 4 (D.N.H.1976), aff'd, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977).
[11] See Note, Symbolic Conduct, 68 Colum.L.Rev. 1091, 1117 (1968) (in order to be protected by the first amendment, conduct must be assertive in nature which "will generally mean that the conduct is a departure from the actor's normal activities and cannot adequately be explained unless a desire to communicate is presumed").
[12] In Davis a father, whose son was killed in a high speed car chase involving the police, claimed that he was displaying the car to express dissatisfaction with police conduct. An observer, however, would likely associate the activity with the everyday noncommunicative function of avoiding the time and expense of moving a worthless wreck.
[13] The defendants argue that Ybarra should be persuasive in this case because it is factually analogous and because it relied exclusively on O'Brien v. United States. The students in the Ybarra case, active in the United Farm Workers' movement, were protesting the university's use of several Teamster-harvested produce items in the campus cafeteria. When the university failed to satisfy the students' demands, the students conducted a sit-in in the president's office. "The protesters subsequently set up several tents and sleeping bags on the library lawn, asserting that they would stay until their demands were met." Ybarra, 550 P.2d at 764. The protesters also used bullhorns and apparently greatly disrupted class. They were arrested for trespassing. The students claimed that the canopy-like tents "symbolized the plight of the farm workers." Id. The court apparently viewed the tents as serving a facilitative rather than expressive function. Tents and sleeping bags generally serve a nonexpressive purpose and, since the students were conducting a round-the-clock vigil, observers would likely view the tents as serving such a nonexpressive facilitative purpose. The Ybarra case fails at least the second part of the Spence test. This court is also not persuaded by the Ybarra decision since the court in that case failed to even consider Spence v. Washington, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), a decision which is critical in evaluating the type of conduct involved here.
[14] In writing the plurality opinion, Judge Mikva applied the test set forth in Spence and had no problem finding the sleep to be protected speech. Community for Creative Non-Violence, 703 F.2d at 592-94 (Wald, J., joining). Judge Edwards similarly found that it was "symbolic speech within the pale of the First Amendment." Id. at 601. The other concurring opinions found the test more difficult to apply to sleep. Although concurring that the sleep in the case was protected speech, Judge Robinson, joined by Judge Wright, stated: "We intimate no view as to whether sleeping would implicate the First Amendment were it not to add its own communicative value to the demonstration." Id. at 600. Judge Ginsberg "hestitated" to equate the sleep with speech since "[i]t has a more commonly recognized aspect; sleep enables the round-the-clock demonstrator to face the next day without exhaustion." Id. at 606-07. Nevertheless, Ginsberg found that the sleep was sufficiently linked with the "symbolic tents" and other aspects of the protest to merit protection. Id. at 607-08.
[15] As a result of the Supreme Court's disposition of the CCNV case, the status of sleep as a protected form of expression remains uncertain. See White House Vigil v. Clark, 746 F.2d 1518, 1540 n. 138 (D.C.Cir.1984). As discussed earlier, however, activities like sleep that typically serve nonexpressive functions present more difficulties than the symbolic displays under consideration in this case.
[16] Evidence at trial showed that the groups involved in this case have registered as student groups through the university's Student Involvement Center. See Registration Application for "Students Against Apartheid" (Defendant's Exhibit "A").
[17] For example, Richard Christensen, charged with the responsibility of approving permits for certain types of student activities, testified that he had previously granted permits for student nuclear group rallies. The university also granted a permit to the student group in this case, authorizing it to display the shanties at their present location. This court need not decide to what extent permits can be required by the university for various free speech activities.
[18] Several university administrators who testified in the case argued that there were, in fact, regulations in place that the students were violating. For example, one witness made a general reference to the existence of state building board regulations without identifying how they specifically apply to this case. Regulations governing the use of campus facilities by off-campus groups were also mentioned, without showing particular relevance to this situation. Reference was made to the university's Speaker Policy (Defendants' Exhibit "H") and rules concerning student demonstrations (University Organization Policies and Procedures § 6.03, Defendants' Exhibit "E"). The Speaker Policy applies "only to those assemblies in which speakers are invited by university organizations." Speaker Policy at § 2(a), p. 1. By definition, a demonstration must involve either 25 or more people or include the use of sound amplification equipment. University Organizational Policies and Procedures at § 6.03(A). As a result, the mentioned regulations do not cover the student expression involved in this case. See Community for Creative Non-Violence v. Watt (CCNV I), 670 F.2d 1213 (D.C.Cir.1982) (expressive sleep fell outside the scope of the Park Service camping regulations). In any event, whether or not there are relevant regulations in place, the university's decision to require removal of the shanties was not based on alleged violations of any regulation.
[19] "An official who can grant or deny the right to speak according to what he deems to be in the `public interest' is indistinguishable in all relevant respects from a censor." Women Strike for Peace v. Morton, 472 F.2d 1273, 1286 (D.C.Cir.1972). See also Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-51, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969); United States v. Abney, 534 F.2d 984, 985-86 (D.C.Cir.1976).
[20] Universities have traditionally prided themselves on making their campuses as rule-free as possible. Certainly rules and regulations detract from a spirit of cooperation and collegiality between students, faculty and administration. Situations like the one involved here, however, make this approach increasingly difficult to maintain. Dr. Logan Wilson, a former president of the American Council on Education, described the situation:

An Ivy League President noted some years ago that the fewer rules and regulations a college or university has for its students, the better. This observation may have been valid for most places then, and for some places now, but I suspect that many of our institutions must face up to the need for more formalization than they once required. This implies a codification of roles, with more specification of behavior norms, and set procedures for their enforcement.
Wilson, Campus Freedom and Order, 45 Denver L.J. 502, 507 (1968).
[21] State v. Ybarra, 25 Or.App. 633, 550 P.2d 763 (1976), did not involve narrowly drawn and clearly stated time, place and manner restrictions. Rather, the students were charged under a general trespass statute. In that case, however, the court held that free speech rights were not implicated, making it unnecessary to determine whether the statute under which the students were charged could be used to regulate free speech.
[22] As an additional reason, the president testified that since the Institutional Council had voted on divestiture and decided against it, he felt that the issue had "had its day" and that the "reason to sustain the discussion had been completed."