**STUDENTS AGAINST APARTHEID CO-ALITION and National Lawyers' Guild, University of Virginia Chapter, Plaintiffs,**

v.

**Robert M. O'NEIL and the Rectors and Board of Visitors of the University of Virginia, Defendants.**

**Civ. A. No. 87–0126–R.**

United States District Court,
W.D. Virginia,
Roanoke Division.

May 15, 1987.

---

Steven D. Rosenfield, D. Brock Green, MacQueen, Rosenfield & Green, Charlottesville, Va., Terri E. Welch, Boyle & Bain, Charlottesville, Va., for plaintiffs.

Roger S. Martin, Associate Legal Advisor and Sp. Asst. Atty. Gen., Charlottesville, Va., for defendants.

## MEMORANDUM OPINION

TURK, Chief Judge.

This case comes before the court on the plaintiffs' motion for a permanent injunction. At issue here are certain regulations of the University of Virginia [1] that the defendants are enforcing to prevent the plaintiffs from erecting symbolic "shanties" on certain areas of the University's campus. For the reasons set forth below the court has determined that the plaintiffs are entitled to relief.

### BACKGROUND

At the root of this case are two historically significant American institutions—the First Amendment to the Constitution and

---

1. The regulations at issue are reproduced in the appendix to this memorandum opinion.

the campus of the University of Virginia, Thomas Jefferson's architectural masterpiece. The plaintiffs are two groups of University of Virginia students who seek to protest the political and racial environment in South Africa and the University's economic investment in that country. The form of their protest is symbolic wooden shacks or shanties that they periodically erect in front of the Rotunda—the campus building in which the University Board of Visitors meets. They assert that the shanties are a form of symbolic speech that is absolutely protected by the First and Fourteenth amendments.

The defendants have continually attempted to prevent the students from erecting the shanties, though they have not otherwise attempted to prevent the students from registering their protest. They argue that the shanties are ugly and that they impair the physical attractiveness of the campus. The University asserts that the constitution permits them to restrict the time, place, and manner of the plaintiff's expressive behavior in order to maintain the architectural integrity and physical beauty of the campus.

The parties appeared before the court on April 20, 1987. At that time, they filed the following stipulation of facts which, pursuant to their request, the court relies on as the only evidence in the case: [2]

DEFINITIONS

1. *The University of Virginia* is an agency of the Commonwealth of Virginia, and a public educational institution created under the Commonwealth's laws.

2. *The Board of Visitors* is the governing body of the University of Virginia. Its members are appointed by the Governor of Virginia, and it in turn appoints the president of the University and is ultimately responsible for all University policy. It decides University policy regarding investments, including those in corporations doing business in the Republic of South Africa, which practices apartheid.

3. *The Lawn* is that portion of the central University grounds consisting of the complex of Jefferson-designed colonnades, pavilions, and Rotunda, and the open grassy area between them extending to a number of newer buildings at the south end, among them Cabell Hall.

The Jefferson-designed original grounds of the University, including the Lawn (including the Rotunda), gardens, and Ranges, have been designated a National Historic Landmark. A 1976 poll of architects by the American Institute of Architects rated these grounds "the proudest achievement of American architecture over the past 200 years." In early 1987, the National Park Service announced the nomination of the Lawn and two other sites as United States additions to the World Heritage list of "irreplaceable properties of outstanding international significance" (see Exhibit 1). That list presently includes thirteen United States sites, two of which are buildings. The Lawn is further described in Exhibits *2* through *5*.

4. *Divestment* is the selling of securities or other holdings in corporations which manufacture, produce, operate, or otherwise do business in the Republic of South Africa. Divestment has been advocated by plaintiffs and many others across the United States as a means for investors to oppose the racist practices of the South African government, a regime whose power is arguably maintained in part by foreign investments. Divestment is the step plaintiffs believe the University of Virginia should immediate-

**2.** The numbered exhibits referred to in the stipulation are as follows: 1) Brochure describing the world Heritage Convention and world Heritage sites; 2) Fundraising brochure about the University of Virginia campus entitled "Jefferson's Living Legacy; 3) Blueprint of the campus Historic District; 4) Aerial photograph of the campus; 5) Excerpt from documentary film entitled "Thomas Jefferson's Academical Village;

6) "Final Report of the President's Ad Hoc Committee on the Use of the Lawn," Sept. 24, 1986; 7) "Acceptance of Policies Adopted by the President on the Use of the Lawn and Use of the Rotunda and the Rescinding of the March 26, 1976 Resolution Setting Forth a Policy Statement On the Use of the Central Grounds, Oct. 2–3, 1986."

ly take with regard to its own investments.

5. *Shanties* are flimsy, shack-like wooden structures, approximately four feet deep, eight feet wide, and eight feet high, with or without walls, floors, or roof, and not fixed or fastened to the ground. Although large enough to hold several people, shanties are not built to serve as dwellings, but as symbolic and evocative lifesize representations, for illustrative, educative and persuasive purposes, of the dwellings of black South Africans in the ghettoes of apartheid.

## PURPOSE OF PLAINTIFFS' SHANTY DEMONSTRATIONS

6. The plaintiffs' purpose in building the shanties is multifold:

a) to educate and inform the University of Virginia community as to the conditions of black South Africans under apartheid, and

b) to make physically explicit the contrast between those conditions and the conditions prevailing on one of America's most beautiful college campuses, because plaintiffs believe the pastoral setting of the University of Virginia grounds deadens public sensitivity to the privations of other peoples, and

c) to influence the hearts and minds of the members of the University of Virginia Board of Visitors, and attempt to persuade them of the moral force of the divestment position.

## HISTORY OF THE PLAINTIFFS' SHANTY DEMONSTRATIONS

7. During the academic year 1985–86, plaintiffs twice conducted demonstrations on the grass of the Lawn in front of the Rotunda, urging the University to divest.

8. On the first occasion, on or about January 31, 1986, plaintiffs erected and caused to remain standing for a period of one to two days two shanties upon the grass of the lawn, within thirty feet of the steps of the Rotunda and facing that building, for the purpose of dramatizing the squalid living conditions of black South Africans and in order to make explicit the contrast between those conditions and the beauty of the Rotunda.

9. On the second occasion, on or about March 20, 1986, plaintiffs erected and caused to remain standing until about April 4, 1986 three to five such structures. At one point during the two weeks of the second demonstration, plaintiffs moved some or all of the shanties a short distance to avoid damage to the grass on which they stood. Students remained with the shanties at all times during the demonstrations, and left without physically damaging the Lawn, its grass, landscape or surrounding structures.

10. In or about April, 1986, shortly after the plaintiffs' second demonstration, the University's student-run internal disciplinary body, the Judiciary Committee, heard charges stemming from that second demonstration. The Judiciary Committee found the building of shanties on the Lawn not to have violated any existing University regulation. Within days after the Judiciary Committee decision, President O'Neil appointed a committee of faculty, administrators and selected students to create a University policy for the use of the Lawn. President O'Neil stated that the policy was being considered in response to the Judiciary Committee's finding that no University rule applied to the building of structures such as shanties on the Lawn. Structures not part of "official University functions," such as convocations, had not been erected on the Lawn within the ten-year period before the building of the shanties.

11. Based on the recommendations of this committee, contained in the "Final Report of the President's Ad Hoc Committee on the use of the Lawn," dated September 24, 1986 ("Final Report"), the President adopted and the Board of Visitors accepted as a permanent policy as of October 2, 1986, rules banning "any structure or extended presence" on the Lawn's upper terraces, bounded by the Rotunda, colonnade and lowermote terrace walkway, except for those connected with "official University functions."

(A copy of the Final Report, and exerpts from the minutes of the October 2, 1986 Board of Visitors meeting at which the Lawn policy was adopted, are attached hereto as Exhibits 6 and 7, respectively.) The Final Report summarizes certain uses and characteristics of the Lawn which the University seeks to protect by its Lawn use regulation.

12. On February 17, 1987, the day of a speech in the Rotunda by President O'Neil on the subject of constitutional freedom of expression, plaintiffs erected a single shanty on the upper portion of the Lawn, within thirty feet of the Rotunda, for the purpose of calling attention to the University's failure to divest, and in order to assert the free speech rights plaintiffs believed were jeopardized by the University's Lawn use policy. The University removed the shanty within one hour of its construction.

PHYSICAL SETTING OF PLAINTIFFS' DEMONSTRATIONS

13. The approximate dimensions of the Lawn are as follows:

| | |
|---|---|
| Colonnade to colonnade | 190 feet |
| Rotunda to highermost terrace verge | 300 feet |
| Rotunda to far end of colonnades | 600 feet |
| Rotunda to lowermost terrace walkway | 700 feet |
| Rotunda to Cabell Hall | 910 feet |

14. Plaintiffs' intention in erecting the shanties is to have them, and the written protest message they bear, clearly and immediately visible to the unaided eye of the Board of Visitors from the time their quarterly meetings are scheduled to begin until the time of their final adjournment. Meetings of the Board of Visitors are customarily held in the Rotunda for two days each quarter year.

15. Plaintiffs require approximately 150 square feet of the Lawn's grass per shanty, a figure which allows for the shanties themselves and a three-foot perimeter around each. The total area of the Lawn's grass between the Rotunda and the verge of the highermost terrace is approximately 57,000 square feet.

16. There has never been a total of more than five shanties on the Lawn at any one time. No shanty has exceeded the approximate size given in paragraph 5 above.

17. The only portion of the Lawn where shanties may be allowed under the Lawn use regulation, by permission of the Dean of Students, is an area of approximately 40,000 square feet at the lower or Cabell Hall end, which is at least 700 feet from the Rotunda at its closest point, and from which plaintiffs' shanties are not immediately visible to observers at or in the Rotunda. Shanties are allowed on the central grounds outside the Lawn, and other student protest activities are permitted on all areas of the Lawn so long as they comply with the University's Lawn use restrictions.

18. The University for years has allowed the conspicuous display of "secret society" insignia, often in letters several feet high, at various places on its grounds outside the Lawn. One such display is a giant white "Z" painted on the University Avenue steps leading to the Rotunda.

**DISCUSSION**

■ At the outset, it is unnecessary for the court to consider whether or not the shanties have expressive content worthy of First Amendment protection. *Cf. University of Utah Student Against Apartheid v. Peterson*, 649 F.Supp. 1200, 1201–07 (D.Utah 1986). The parties have stipulated that the shanties are "symbolic and evocative lifesize representations for illustrative, educative and persuasive purposes, of the dwellings of black south Africa in the ghettoes of apartheid." The shanties' particularized message and the purposes for which the plaintiffs constructed them make it abundantly clear they are a form of expressive symbolic communication that receives protection from the First Amendment. *See Spence v. Washington*, 418 U.S. 405, 410–11, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974).

■ The conclusion that the shanties constitute a form of protected speech does

not compel a ruling that any restriction of the shanties is an infringement on the students' constitutional rights. All public speech, symbolic or otherwise, is subject to reasonable restrictions on the time, place, and manner of expression. *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3068, 82 L.Ed.2d 221 (1984). Time, place, and manner restrictions "are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Id.* at 293, 104 S.Ct. at 3069, *see also, United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). The validity of the defendants' absolute prohibition of shanties therefore depends on whether the regulations comply with these constitutional requirements.

As history demonstrates, the University of Virginia campus is an architectural masterpiece, a national landmark, and a popular tourist site. The defendants assert that their interest in maintaining the esthetic integrity of the campus is the sole justification for their lawn use regulations and that this interest justifies their broad restrictions on the plaintiffs' behavior. The court respects the University's efforts to preserve the physical and esthetic condition of this historic site. Indeed, the court recognizes that the University may legitimately exercise its powers to advance the substantial interest in maintaining the esthetic value of the campus. *City Council v. Taxpayers for Vincent,* 466 U.S. 789 805, 104 S.Ct. 2118, 2128, 80 L.Ed.2d 772 (1984); *see also, Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 129, 98 S.Ct. 2646, 2661, 57 L.Ed.2d 631 (1978); *Village of Belle Terre v. Boraas,* 416 U.S. 1, 9, 94 S.Ct. 1536, 1541, 39 L.Ed.2d 797 (1974).

Yet while the University's substantial interest in maintaining the pristine scenery of the campus might justify some restrictions on protected speech, here the University's regulation bears no cognizable relationship to the esthetic interest that is supposedly at stake. The defendants fail to substantiate the need for a ban on the particular kind of structure that the plaintiffs seek to use and they understate the significance of a university campus as a forum for robust open expression.

This case involves the central lawn of a large university. Mindful of the traditional role of the university as an invaluable marketplace of ideas, *Healy v. James,* 408 U.S. 169, 180–81, 92 S.Ct. 2338, 2345–46, 33 L.Ed.2d 266 (1972), and the similarity between an open campus lawn and a traditional public forum like municipal parks, *Widmar v. Vincent,* 454 U.S. 263, 267 n. 5, 102 S.Ct. 269, 273 n. 5, 70 L.Ed.2d 440 (1981), the court will examine the defendant's regulations in light of the cases that concern attempts to regulate speech in public places. Its central concern is whether the regulations at issue "respond precisely to the substantive problems" that legitimately concern the defendants. *Vincent, supra,* 466 U.S. at 810, 104 S.Ct. at 2132; *Clark, supra,* 468 U.S. at 297, 104 S.Ct. at 3071.

█ Before the university promulgated its lawn use rules, the plaintiffs had twice constructed shanties to highlight the problems of apartheid. At those times, the students acted independently to protect the historic lawn. After the demonstrations they left without physically damaging the lawn. By contrast, the university has presented no evidence that these plaintiffs inflicted any temporary or permanent damage prior to the enactment of the regulation. Furthermore, unlike other cases in which restrictions rooted in esthetics also served goals of ensuring public safety, *see Vincent, supra,* 466 U.S. at 802, 104 S.Ct. at 2127, protecting public resources, *see Clark, supra,* 468 U.S. at 296, 104 S.Ct. at 3070, or maintaining presidential security, *White House Vigil For the ERA Comm. v. Clark,* 746 F.2d 1518, 1533 (D.C.Cir.1984), nowhere do the defendants contend that the shanties are inimical to the rights of others who use the campus for the purposes for which it was created. *See United States v. Grace,* 461 U.S. 171, 182, 103 S.Ct. 1702, 1709, 75 L.Ed.2d 736 (1983);

*Clark, supra,* 468 U.S. at 300, 104 S.Ct. at 3072 (Burger, C.J., concurring).

Despite that the facts point out the care with which the plaintiffs erected, maintained, and removed the shanties, and their failure to damage the lawn, the university nonetheless argues that the shanties threaten the historic campus edifices and that the lawn use regulations are the least restrictive means towards averting that threat. The court cannot purport to second guess the University's appraisal of how much protection the campus requires or how to attain an acceptable level of preservation. *Clark,* 468 U.S. at 299, 104 S.Ct. at 3072. But when the University has stipulated that the shanties did not damage the lawn in any way, the court cannot conclude that the current lawn use regulations are the necessary and least restrictive means to protect its sole interest in the esthetic integrity of the campus. The University fails to prove a sufficient nexus between its esthetic interest and its broad restraint of plaintiffs' communicative behavior. *Grace, supra,* 461 U.S. at 181, 103 S.Ct. at 1709.

█ In a similar vein, the defendants try to justify their regulations by claiming that the lawn use rules specify and allow numerous forms of expression besides shanties and that the plaintiffs remain free to register their protest on the lawn through several permissible modes. The plaintiffs argue, however, that the regulations fail to adequately warn them of the types of activity proscribed and that they fail to set out clear standards by which to determine whether certain activities are or are not permissible. *Broadrick v. Oklahoma,* 413 U.S. 601, 607, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1973).

The plaintiffs complain particularly about the terms "structure" and "extended presence" in the lawn use regulations. The students point out that without precise definitions of these terms, they are unable to know precisely what kind of behavior the regulations proscribe. The court agrees. Absent more specific definitions of certain phrases, particularly the imprecise term "extended presence," the language is so vague that it fails to alert students as to the scope of its prohibitions and therefore may discourage students from using the lawn as a forum even for clearly protected expression.[3]

█ The University finally urges that its restrictions are constitutional because they provide the plaintiffs with ample alternative means to communicate their message. It suggests that the plaintiffs build their shanties on the University central grounds or on the lower lawn areas beyond earshot or clear sight of the Rotunda, or that the students use the mails, newspapers, or other media to convey their anti-apartheid sentiments. None of these alternatives are sufficient to vitiate the University's sweeping restraints on its students' protected behavior.

█ "The First Amendment protects the right of every citizen to 'reach the minds of willing listeners and to do so there must be opportunity to win their attention.' " *Heffron v. International Soc. for Krishna Consciousness,* 452 U.S. 640, 655, 101 S.Ct. 2559, 2568, 69 L.Ed.2d 298 (1981) (quoting *Kovacs v. Cooper,* 336 U.S. 77, 87, 69 S.Ct. 448, 453, 93 L.Ed. 513 (1949)). Accordingly, when a state body provides a citizen with an alternative forum for expression it should open up a forum that is accessible and where the intended audience is expected to pass. *Id.* at 655 n. 16, 101 S.Ct. at 2568 n. 16.

Here, the students' intended audience is The Board of Visitors that meets for two days, four times a year, in the Rotunda. The Board of Visitors does not frequent the areas of the campus to which the University seeks to relegate the shanties. The option of building the shanties on spots

---

**3.** Even if the university were to apply common sense in interpreting the regulations, *see Juluke v. Hodel,* 811 F.2d 1553, 1560–61 (D.C.Cir.1987), it would still fail to apprise the students of the precise meaning of extended presence. Does "extended presence" mean one student standing on the lawn for fifteen minutes or one hundred students camping on the lawn for two days? The common sense meaning of extended and presence would allow for both possibilities and for numerous others.

invisible from the Rotunda eliminates the students' ability to win the attention of the Board of Visitors and is thereby an inadequate alternative outlet for the plaintiffs' expressive conduct.

The court doubts that the University's other suggestions, that the plaintiffs use the mails and other forms of media, offer ample alternative channels for communication. These options involve more cost and less autonomy than the shanties, are less likely to reach the Board of Visitors who may not deliberately be seeking information about apartheid, and might be less effective for delivering the message that is conveyed by the sight of a shanty in front of the Rotunda. *Linmark Assoc. Inc. v. Willingboro*, 431 U.S. 85, 93, 97 S.Ct. 1614, 1618, 52 L.Ed.2d 155 (1977).

## CONCLUSION

■ The defendants do have authority to regulate protected student expression by enacting reasonable restrictions on time, place, and manner. And the court does not intend to prevent the University from ever regulating the plaintiffs' behavior. To do so, however, the University must enact narrowly tailored regulations that meet the constitutional standards for restrictions on the time, place and manner of protected expression. The regulations challenged in the case fail to meet those standards.

The current lawn use regulations are beyond the range of the University's legitimate authority because they are vague, are too broad to satisfy the University's legitimate interest in esthetics, and fail to provide the plaintiffs with a meaningful alternative channel for expression. Therefore, the court will direct the defendants not to enforce against these plaintiffs, at the May meeting of the Board of Visitors, the regulations as currently worded.

An order consistent with this opinion will be entered on this day.

## APPENDIX

FINAL REPORT OF THE PRESIDENT'S AD HOC COMMITTEE ON THE USE OF THE LAWN

September 24, 1986

This report addresses the uses of that part of the University of Virginia Historic District which *includes* the entire area between McCormick Road and Hospital Drive (on the West and East, respectively) and University Avenue and the Boundary formed by Pavilions IX and X, Rouss Hall, Old Cabell, and Cocke Hall (on the North and South, respectively). *Excluded*, for example, is the Amphitheatre.

The Lawn is the geographical and spiritual heart of the University. The entire University Community—student, faculty, administrators—are its trustees, as well as the beneficiaries of this beauty and usefulness. To use who ar here now have been given both all the benefits that we currently enjoy from the Lawn and also the obligation to preserve those benefits for future generations.

We emphasize that the Lawn has extremely diverse uses and characteristics, among which are the following:

1. It is a national and international historic treasure.

2. It is a center of highly varied day-to-day academic activities.

3. It is used occasionally as a setting for University activities, such as official convocations.

4. It is a residential precinct for students and faculty.

5. It is an area for limited active and passive outdoor recreational activities.

6. It is a site for a steady stream of visitors and tourists from all over the world.

The University Community has developed a proud tradition of mutual accommodations of all these diverse uses. The Lawn must perforce be open and accessible under reasonable rules and regulations (many of which are and have long been in place, administered, a.o., by the Office of the Vice President for Student Affairs, the Rotunda Administration, *et. al.*).

The Lawn is replete with fragile, delicate structures and landscape content. Preservation is a constant concern and a burgeon-

ing curatorial responsibility. That responsibility has been entrusted to the University as part of its fiduciary obligations to future generations. The danger that misuse of the Lawn presents to the historic edifices, and to their dependencies and surroundings, are real, not theoretical. Differing rules and regulations may apply to different parts of the Lawn—e.g., the lower terrace may be governed by different safety precautions and regulations from those that apply to the upper three terrace. Moreover, space limitations and the plethora of requests for facilities perforce dictate orderly administrative rules, always provided that these rules will be content neutral.

Pursuant to the foregoing reflections and considerations, your committee therefore resolves:

A. That the gardens of the Pavilions are public areas. Those garden areas adjacent to the Pavilions are not required to be open to the public at all times. They are to be open when not in personal use, and they must be open on certain occasions, e.g., Garden Week. To temporarily close these adjacent gardens for personal use by the Pavilion residents, an appropriate sign may be placed upon the gates notifying the public. Where the garden is divided into two portions by an intervening wall, the remote section shall be open to the public at all times. The use of the gardens for social gatherings of University organizations is to be permitted where consistent with the occupancy of the Pavilion as home by the resident.

B. That for the upper terraces of the Lawn (those between the Rotunda and the crosswalk at the northern limit of the "Homer Terrace" at the South) no structure or extended presence shall be permitted on the Lawn except for those needed in connection with official University functions. The same rule shall be in effect for the lower ("Homer") terrace, except that for that area of the lawn officially recognized student groups, academic or administrative departments, or University-related organizations or foundations may be granted use by the Office of the Dean of Students. That office will consider use in accordance with dictates affecting time, place, and manner. Among these are the following:

1. The use of the designated space ("Homer Terrace") by any one group at any time shall not exceed three consecutive days.

2. Disruption or obstruction of teaching, research, administration, disciplinary procedure, or other University activities, or of other authorized activities on University property is forbidden. (See Chapter 6, "Regulations", A: "Standards of Conduct," Item 4, p. 78 of *The 1986–87 Colonnades,* the "Student Handbook.")