**STUDENTS AGAINST APARTHEID CO-ALITION, National Lawyers Guild, Univ. of Virginia Chapter, Plaintiffs**

v.

**O'NEIL, Robert M., Individually and in his official capacity as President of the University of Virginia, the Rector and Board of Visitors of the University of Virginia, Defendants.**

Civ. A. No. 87–0274–R.

United States District Court,
W.D. Virginia,
Roanoke Division.

Sept. 25, 1987.

Steven D. Rosenfield, MacQueen, Rosenfield & Green, Terri E. Welch, Boyle & Bain, Charlottesville, Va., for plaintiffs.

George G. Gratton, IV, Legal Adviser and Sp. Asst. Atty. Gen., Charlottesville, Va., for defendants.

### MEMORANDUM OPINION

TURK, Chief Judge.

This case comes before the court on plaintiff's Motion for Preliminary Injunction and defendants' Motion for Summary Judgment. At issue is the University of Virginia's amended Lawn Use Policy. Plaintiffs contend that defendants' enforce-

ment of these regulations violates their first amendment rights. For the reasons set forth below, the court has determined that the amended regulations are constitutional and that defendants' motion is granted.

Several months ago, these parties were before this court presenting similar issues. *Students Against Apartheid Coalition v. O'Neil,* 660 F.Supp. 333 (W.D.Va.1987) (hereinafter *SAAC*). In that decision, this court found the University of Virginia's Lawn Use Policy to be unconstitutional. The policy regulating plaintiffs' freedom of speech was unconnected to the University's professed esthetic interest. The policy was also unconstitutionally vague, failing to alert students of the scope of the policy. *Id.* at 338–39. Since that time, the University amended its regulations in an attempt to address the unconstitutional areas. A revised Lawn Use Policy was promulgated by defendant Robert M. O'Neil, President of the University of Virginia, on May 25, 1987. Specifically, the changes defined the term "structure" and omitted the ambiguous phrase "extended presence". *See* Appendix.

On May 28, 1987, during a scheduled meeting of the University of Virginia's Board of Visitors, the plaintiffs held a demonstration protesting apartheid in South Africa. As part of the protest, plaintiffs erected a shanty in front of the University's Rotunda. The Rotunda is part of the historic Lawn area, originally designed by Thomas Jefferson. Minutes after the shanty was built, University personnel removed the shanty pursuant to the new Lawn Use Policy. The demonstrators were not disturbed. Plaintiffs now seek to enjoin enforcement of the University's revised Lawn Use Policy.

Plaintiffs contend the revised policy is, in essence, no different from the prior unconstitutional policy and seek to bar defendants from relitigating the issue under the doctrine of collateral estoppel. This court finds that the University's revisions, although minor in appearance, substantively change the Lawn Use Policy and warrant a new constitutional analysis of the amended policy.

In their complaint, plaintiffs incorporate by reference the Stipulation of Facts agreed to by both parties in the earlier case. Defendants, in failing to object, agree to the facts stipulated in the prior suit. The only material differences are the outlined changes in the Lawn Use Policy.

■ The initial step in the first amendment analysis is to determine if the plaintiffs' expression in the form of a shanty, is constitutionally protected. The Supreme Court, in *Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), identified two factors that determine protected symbolic expression or conduct. The first factor, whether a party intended his symbolic expression to convey a particularized message, is not disputed by these parties. In the Stipulation of Facts, the parties state that shanties are "symbolic and evocative lifesize representations, for illustrative, educative, and persuasive purposes, of the dwellings of black South Africans in the ghettoes of apartheid." *SAAC,* 660 F.Supp. at 336; *see University of Utah Students Against Apartheid v. Peterson,* 649 F.Supp. 1200 (D.Utah 1986).

The second factor, whether the message will be understood by viewers, has previously been answered in the affirmative by this court. *SAAC,* 660 F.Supp. at 337; *see University of Utah,* 649 F.Supp. at 1205 ("Shanties, as structures, have come to symbolize the poverty, oppression and homelessness of South African blacks and have been used by student groups throughout the United States to convey this same message.").

■ As constitutionally protected expression, plaintiffs' speech remains subject to reasonable time, place, and manner restrictions. *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3068, 82 L.Ed.2d 221 (1984). Such restrictions are valid provided that they are content-neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication. *Regan v. Time, Inc.,* 468 U.S. 641, 648, 104 S.Ct.

3262, 3266, 82 L.Ed.2d 487 (1984); *see also United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Defendants' new Lawn Use Policy meets these constitutional requirements. Plaintiffs do not contend, nor do the facts suggest, that the challenged Lawn Use Policy is directed at the subject matter of the expression. Nor do plaintiffs argue that the defendants' policy was applied in a discriminatory manner. The court therefore concludes the Lawn Use Policy is content neutral.

As to the interest of defendants in regulating expressive conduct, this court recognized in *SAAC* that the University has a valid interest in preserving the "esthetic integrity" of its historic grounds. 660 F.Supp. at 338. Regulations of speech based on esthetic concerns alone have been found constitutional. *See White House Vigil for the ERA Committee v. Clark,* 746 F.2d 1518, 1535 (D.C.Cir.1984); *see also Members of the City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981).

Content neutral regulations based on a proper interest must still be narrowly tailored to focus on this interest. *Clark,* 468 U.S. at 296, 104 S.Ct. at 3070. The degree of requisite narrowness is a legal question. *White House Vigil,* 746 F.2d at 1529. The court's role is not to determine this degree, nor to substitute its judgment for that of the University. *Clark,* 468 U.S. at 299, 104 S.Ct. at 3072. Rather, the court must determine if the new Lawn Use Policy lies within the "zone of constitutionality" prescribed by the first amendment. *White House Vigil,* 746 F.2d at 1531.

The specific esthetic concern of the University is the architectural value of the Lawn area. *SAAC,* 660 F.Supp. at 338. A Lawn Use Policy which prohibits certain types of expressive conduct must exhibit a cognizant relationship between the policy and "the ends it was designed to serve." *Clark,* 468 U.S. at 297, 104 S.Ct. at 3071.

The defendants' new Lawn Use Policy regulates only "structures". A structure is defined and confined to those physical objects which would interrupt the architectural lines of the historic area. The policy restricts structures from only a small section of the historic area, namely the south side of the Rotunda. Plaintiffs believe the "contrast" between the shanty and Rotunda is essential to their message. However, the facts do not indicate only the south side of the Rotunda will effectively communicate plaintiffs' message to the Board of Visitors. Plaintiffs are free to erect structures on the remaining three sides of the Rotunda, which are highly visible from the access roads.

Another indication of the University's efforts to tailor its policy to fit the constitutional mold is the omission of the ambiguous phrase "extended presence". A "common sense" reading of "extended" and "presence" might refer to time or the size of a student demonstration. *SAAC,* 660 F.Supp. at 339 n. 3. Without this phrase, the policy focuses solely on architecture, reinforcing the nexus between the University's concern and theregulation. Thus, the new Lawn Use Policy restricting structures is narrowly tailored to achieve the University's professed esthetic interest in preserving the Lawn's architectural purity.

Because the policy is of requisite narrowness, alternate means of communication are available to plaintiffs. Structures are but one form of communication. In disallowing only "structures" as defined in the policy, defendants implicitly allow the wide range of expressive modes not listed. For example, the new policy does not prohibit demonstrations, sit-ins, marches, hand-held signs or other forms of protest. As evidence of permissible uses of the Lawn, when the University enforced its new policy, only the shanty was removed. The demonstrators were permitted to continue their protest on the Lawn. While the alternatives may not be plaintiffs' first choice of expression, "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. International Society For Krishna Con-*

*sciousness,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981).

 The court found the University's Lawn Use Policy was also unconstitutional on grounds of vagueness. *SAAC,* 660 F.Supp. at 339. The defendants revised their Lawn Use Policy to address specifically this failing. The new policy defines a structure to include "props and displays, such as coffins, crates, crosses, theater, cages, and statues; furniture, and furnishings, such as desks, tables ... book cases, and cabinets; shelters, such as tent, boxes, shanties and other enclosures; and other similar physical structures." *See* Appendix. Anticipating questions of this definition, the new policy also defines what are not structures: "chairs, signs held by hand, bicycles, baby carriages, and baby strollers temporarily placed in, or being moved across the lawn; and wheelchairs and other devices for the handicapped." *See* Appendix. In addition, the University removed the unclear phrase "extended presence", eliminating any difficulty in interpreting its meaning. Every statute or regulation may be faulted for vagueness as any number of hypothetical interpretations may be proposed. *Juluke v. Hodel,* 811 F.2d 1553, 1561 (D.C.Cir.1987). The Lawn Use Policy must be read with common sense. Similarly, the policy must be enforced with common sense. *Id.* at 1560. This court finds the revised policy sufficiently clear.

The University of Virginia may regulate the symbolic speech of its students to preserve and protect the Lawn area as an architectural landmark. To be constitutionally permissible, the regulation must be reasonable in time, place and manner. The revised Lawn Use Policy lies within the constitutional boundaries of the first amendment. The new policy is content-neutral, precisely aimed at protecting the University's esthetic concern in architecture, and permits students a wide array of additional modes of cummunication. The new policy is also sufficiently detailed to inform students as to the types of expression restricted on the Lawn. Because the revised Lawn Use Policy does not offend constitutional protections of free speech,

defendants' motion for summary judgment is granted.

### APPENDIX

### UNIVERSITY POLICY ON USE OF THE LAWN

[This policy was originally adopted by President Robert M. O'Neil upon his receipt of the Final Report of the President's Ad Hoc Committee on the Use of the Lawn, dated September 24, 1986. That Policy was approved by the Board of Visitors at its October, 1986 meeting. Subsequently, on May 15, 1987, President O'Neil amended paragraph B of the Policy.]

This report addresses the uses of that part of the University of Virginia Historic District which *includes* the entire area between McCormick Road and Hospital Drive (on the West and East, respectively) and University Avenue and the Boundary formed by Pavilions IX and X, Rouss Hall, Old Cabell, and Cocke Hall (on the North and South, respectively). *Excluded,* for example, is the Amphitheatre.

The Lawn is the geographical and spiritual heart of the University. The entire University Community—students, faculty, administrators—are its trustees, as well as the beneficiaries of this beauty and usefulness. To us who are here now have been given both all the benefits that we currently enjoy from the Lawn and also the obligation to preserve those benefits for future generations.

We emphasize that the Lawn has extremely diverse uses and characteristics, among which are the following:

1. It is a national and international historic treasure.

2. It is a center of highly varied day-to-day academic activities.

3. It is used occasionally as a setting for University activities, such as official convocations.

4. It is a residential precinct for students and faculty.

5. It is an area for limited active and passive outdoor recreational activities.

6. It is a site for a steady stream of visitors and tourists from all over the world.

The University Community has developed a proud tradition of mutual accommodations of all these diverse uses. The Lawn must perforce be open and accessible under reasonable rules and regulations (many of which are and have long been in place, administered, a.o., by the Office of the Vice President for Student Affairs, the Rotunda Administration, *et al.*).

The Lawn is replete with fragile, delicate structures and landscape content. Preservation is a constant concern and a burgeoning curatorial responsibility. That responsibility has been entrusted to the University as part of its fiduciary obligations to future generations. The danger that misuse of the Lawn presents to the historic edifices, and to their dependencies and surroundings, are real, not theoretical. Differing rules and regulations may apply to different parts of the Lawn—e.g., the lower terrace may be governed by different safety precautions and regulations from those that apply to the upper three terraces. Moreover, space limitations and the plethora of requests for facilities perforce dictate orderly administrative rules, always provided that these rules will be content neutral.

Pursuant to the foregoing reflections and considerations, your committee therefore resolves:

A. That the gardens of the Pavilions are public areas. Those garden areas adjacent to the Pavilions are not required to be open to the public at all times. They are to be open when not in personal use, and they must be open on certain occasions, e.g., Garden Week. To temporarily close these adjacent gardens for personal use by the Pavilion residents, an appropriate sign may be placed upon the gates notifying the public. Where the garden is divided into two portions by an intervening wall, the remote section shall be open to the public at all times. The use of the gardens for social gatherings of University organizations is to be permitted where consistent with the oc-cupancy of the Pavilion as home by the resident.

B. That for the upper terraces of the Lawn (those between the Rotunda and the crosswalk at the northern limit of the "Homer Terrace" at the South) no structure shall be permitted on the Lawn except for those needed in connection with official University functions. (The term "structure" includes props and displays, such as coffins, crates, crosses, theaters, cages, and statues; furniture, and furnishings, such as desks, tables (except those temporarily used by participant in the ceremonies or by University officials for the conduct of the ceremonies), bookcases, and cabinets; shelters, such as tents, boxes, shanties and other enclosures; and other similar physical structures. The term "structure" does not include chairs, signs held by hand, bicycles, baby carriages, and baby strollers temporarily placed in, or being moved across the Lawn; and wheelchairs and other devices for the handicapped when used by handicapped persons.) The same rule shall be in effect for the lower ("Homer") terrace, except that for that area of the Lawn officially recognized student groups, academic or administrative departments, or University-related organizations or foundations may be granted use by the office of the Dean of Students. That office will consider use in accordance with dictate affecting time, place, and manner. Among them are the following:

1. The use of the designated space ("Homer Terrace") by any one group at any time shall not exceed three consecutive days.

2. Disruption or obstruction of teaching, research, administration, disciplinary procedure, or other University activities, or of other authorized activities on University property is forbidden. (See Chapter 6, "Regulations" A: "Standards of Conduct," Item 4, p. 78 of *The 1986–87 Colonnades*, the "Student Handbook.")